62 Cal.App.4th 1332 (1998)
FAMILIES UNAFRAID TO UPHOLD RURAL EL DORADO COUNTY et al., Plaintiffs and Appellants,
v.
BOARD OF SUPERVISORS OF EL DORADO COUNTY et al., Defendants and Respondents; COOK RANCH PARTNERS, Real Party in Interest and Respondent.
Docket Nos. C025674, C026477.
Court of Appeals of California, Third District.
March 9, 1998.
*1334 COUNSEL
Randy L. Barrow and Thomas P. Infusino for Plaintiffs and Appellants.
Louis B. Green, County Counsel, Edward L. Knapp, Chief Assistant County Counsel, Ellman, Burke, Hoffman & Johnson, Howard N. Ellman, John D. Hoffman and Paul J. Neibergs for Defendants and Respondents and for Real Party in Interest and Respondent.
[Opinion certified for partial publication.[1]]
OPINION
DAVIS, J.
In this action, the City of Plymouth, the Foothill Conservancy, and an unincorporated association, Families Unafraid to Uphold Rural El *1335 Dorado County (also known as FUTURE) (collectively, the plaintiffs), have filed a petition for writ of mandate and a complaint for declaratory and injunctive relief against El Dorado County and its board of supervisors (collectively, County, or individually County and Board, as indicated). Plaintiffs allege the Board failed to comply with the County's draft general plan and with the California Environmental Quality Act (CEQA) in approving the "Cinnabar" residential subdivision project. Cook Ranch Partners (Cook), the real party in interest, is Cinnabar's developer.
Cinnabar is a planned development residential subdivision encompassing 566 lots on 7,868 acres of land (about 12 square miles), with an equestrian theme and nearly 2,900 acres of open space. The project site is in the southwestern portion of County and is currently used for grazing. The site is roughly six miles in length (north to south) and two miles in width. The northern boundary of the project site is about four miles south of the town of El Dorado. The southern boundary is about six miles north of the City of Plymouth (which is in Amador County).
The trial court ruled in County's favor, and awarded County judgment and costs. In two consolidated appeals (one of which deals only with the issue of costs), plaintiffs raise a plethora of issues. We conclude, in the published portion of this opinion, that Cinnabar is inconsistent with the land use element of County's draft general plan. In the unpublished portion, we conclude: One of the Board's findings regarding consistency with the agriculture and forestry element (i.e., the Nielsen Ranch) is not supported by substantial evidence; Cinnabar is inconsistent with the noise element of the draft general plan; the Board's findings rejecting project alternatives "C," "D," and "E" as economically infeasible are not supported by substantial evidence; the deferred impact analysis/mitigation measure for past mining contamination does not meet CEQA standards; the cumulative wildlife habitat analysis in the environmental impact report (EIR) is adequate if certain assumptions are true; the EIR must respond to the public inquiries about the effectiveness of County's erosion plan and about Cook's compliance history with mitigation measures; and the Board's findings regarding Cinnabar's rezoning, planned development, and tentative subdivision map are inadequate to the extent they are based on these deficiencies. In light of these conclusions, we reverse the judgment and the award of costs to County. We also remand on the question of administrative record copying costs requested by plaintiffs. For guidance of the parties, we address and reject plaintiffs' other contentions.

*1336 DISCUSSION

1. Consistency With the Draft General Plan

a. Background and Standard of Review

(1) Every county and city must adopt a "comprehensive, long-term general plan for the physical development of the county or city...." (Gov. Code, § 65300.) "The general plan has been aptly described as the `constitution for all future developments' within the city or county.... `[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements' [statutorily required elements include land use, circulation, housing, conservation, open space and noise]." (Citizens of Goleta Valley v. Board of Supervisors (1990) 52 Cal.3d 553, 570 [276 Cal. Rptr. 410, 801 P.2d 1161], citations omitted (Citizens); Gov. Code, § 65302.) "The consistency doctrine has been described as `the linchpin of California's land use and development laws; it is the principle which infuse[s] the concept of planned growth with the force of law.' ..." (Corona-Norco Unified School Dist. v. City of Corona (1993) 17 Cal. App.4th 985, 994 [21 Cal. Rptr.2d 803], citation omitted (Corona).)
A project is consistent with the general plan "`if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.'" (Corona, supra, 17 Cal. App.4th at p. 994, quoting an advisory general plan guideline from the state Office of Planning and Research.) A given project need not be in perfect conformity with each and every general plan policy. (Sequoyah Hills Homeowners Assn. v. City of Oakland (1993) 23 Cal. App.4th 704, 719 [29 Cal. Rptr.2d 182] (Sequoyah).) To be consistent, a subdivision development must be "compatible with" the objectives, policies, general land uses and programs specified in the general plan. (Id. at pp. 717-718.)
County was updating its general plan when Cook submitted the Cinnabar project for approval. As it was authorized to do, the state Office of Planning and Research (OPR) required County to make findings, reasonably supported by evidence in the record, (1) that any development County approved be consistent with County's public review draft general plan (Draft General Plan), and (2) that there be little or no probability that the development would be detrimental to or interfere with the future adopted general plan. (Gov. Code, § 65361, subds. (c)(3), (d), (e); Harroman Co. v. Town of Tiburon (1991) 235 Cal. App.3d 388, 394-396 [1 Cal. Rptr.2d 72]; see also Topanga Assn. for a Scenic Community v. County of Los Angeles (1974) 11 *1337 Cal.3d 506, 511-518 [113 Cal. Rptr. 836, 522 P.2d 12] [an agency's administrative findings must disclose evidence-based reasoning].)
The Board did make such findings, stating:
"1. The proposed project, including design and improvements, is consistent with the public review Draft General Plan Policies and Land Use Map because it carries out and implements the important policies of integrating low density residential development with preservation and enhancement of large-scale open space resources, improving public access to open space, locating and preserving cultural resources and providing a type of residential development that is not otherwise available in the County, all as part of the project features under the approval conditions.
"2. There is little or no probability that the project will be detrimental to or interfere with the future adopted General Plan because:
"i) It provides for a low density rural residential use, employing cluster development concepts to enhance environmental sensitivity, over that of a more typical large lot subdivision, with a sensitive relationship between the residential areas and the open space to be preserved in a manner that exemplifies the type of sound planning that should be encouraged within the County;
"ii) The project calls for set-aside management and preservation of approximately 3,000 acres of open space in scenic, attractive country very desirable for regional open space use with hiking trails and other provision for limited public access;
"iii) The project approval conditions will implement an unprecedented and detailed arrangement for location and protection of archeological resources, artifacts and sacred sites associated with former use of the project area by Native Americans;
"iv) The project approvals require that the project applicant implement a detailed wildland fire management plan to provide sanctuary areas available for project residents and others in the vicinity;
"v) Development of the project will create a demand for approximately 2,000 construction related jobs and 500 permanent jobs at full buildout; and
"vi) [T]he project will meet a demand for a type of housing that is in short supply within the County."
*1338 (2a) Plaintiffs claim that Cinnabar is inconsistent with the Draft General Plan. They also claim that the Board's findings of consistency with the Draft General Plan and compatibility with its future general plan are not supported by substantial evidence. As we explain in the published portion of this opinion, we agree that Cinnabar is inconsistent with the Draft General Plan's land use element. In the unpublished portion, we conclude that Cinnabar is inconsistent with the noise element and that a finding regarding the agriculture and forestry element is not supported by substantial evidence.
(3) The Board's determination that Cinnabar is consistent with the Draft General Plan carries a strong presumption of regularity. (Sequoyah, supra, 23 Cal. App.4th at p. 717.) This determination can be overturned only if the Board abused its discretion  that is, did not proceed legally, or if the determination is not supported by findings, or if the findings are not supported by substantial evidence. (Ibid.) As for this substantial evidence prong, it has been said that a determination of general plan consistency will be reversed only if, based on the evidence before the local governing body, "... a reasonable person could not have reached the same conclusion." (No Oil, Inc. v. City of Los Angeles (1987) 196 Cal. App.3d 223, 243 [242 Cal. Rptr. 37].)

b. Land Use Element

(2b) In June 1992, Cook asked County to rezone the Cinnabar property from RA-40 and RA-80 (residential agriculture, 40- and 80-acre parcels) to RE-10/PD (residential estate, 10-acre/planned development). Shortly thereafter, Cook sought planned development and tentative subdivision map approval for the proposed lots, ranging in size from five to eighty acres. As noted, County was updating its general plan at this time.
On January 11, 1994, the Board approved a Draft General Plan, consisting of the goals, objectives and policies specified in a third draft and the land use maps set forth in a second draft. The land use map of the second draft specified a "RRL" land use designation (rural residential low density, 1 dwelling unit per 40-160 acres) for almost all the Cinnabar site (with a "NR" [natural resources] designation comprising the remainder).
At the January 11 proceeding, a Cinnabar representative referred to this land use map and said: "[T]he problem is we're stuck now in the way the map process came down ... and we're here to ask to get unstuck so we can keep going.... [T]he RRL... virtually kills the project...." County counsel later cautioned the Board that "if you're going to be amending the [Draft General Plan], that you're going to need ... a due process type *1339 procedure to amend [it]." The Board then decided to reserve a decision on the general plan land use designation for Cinnabar.
On February 15, 1994, County's planning director proposed a Draft General Plan land use designation for Cinnabar that combined the RR (rural residential, 1 dwelling unit per 20-160 acres) and the LDR (low-density residential, 1 dwelling unit per 5 acres) land use designations. Under this proposal, the RR category would apply to 5,654 acres of the Cinnabar property and the LDR category to 1,400 acres (about 18 percent of the site), in a "floating" manner without specifically mapped boundaries; this would permit a planned development of up to 579 residential units.[2] According to the planning director, this proposal could allow the project to go forward and be reviewed under the current EIR and the Draft General Plan. But the planning director had also cautioned that designating LDR on the Cinnabar site ran counter to Draft General Plan policies that required LDR to be contiguous to community regions or rural centers, that required LDR not to be separated from these areas by the rural residential land-use designation, and that precluded previously "platted" (subdivided) lands from being used to justify new incompatible land uses.
At the February 15 Board proceeding, Cook's counsel responded to the planning director's proposal and comments as follows: "[I]t should be clear that the [proposal] that you have before you will not commit you to anything. It doesn't approve a project. It doesn't approve an inclusion in a final general plan. It simply defines the scope of a study that will be ongoing. You reserve the right ... to suspend all or portions of general plans after they are adopted."
On March 1, 1994, the Board considered the planning director's proposal. The planning director reiterated: "There is one area of concern and I believe I discussed [it] last time with the Board.... In its purer sense, low density residential [LDR] does not work on [the Cinnabar] property based on the framework of the rest of the land use designations and the land use pattern in the area. And that's why I'm recommending ..., if [the Board] desire[s] to go forward, that you create a ... maximum density using the rural residential category [RR] and the LDR category but ... doing it as a floater and not being specific in terms of where those particular land use designations would apply."
*1340 The Board then adopted, on a three-to-two vote, the proposal of the planning director, who had noted "that the density can be shifted throughout the property ... depending on land use constraints."[3]
Policy 2.2.1.2 of the Draft General Plan's land use element governs land use designations and specifies in pertinent part:
"To provide for an appropriate range of land use types and densities within the County, the following General Plan land use designations are established and defined....
"Low Density Residential (LDR) ... The application of the LDR land use designation shall be further restricted to those lands contiguous to Community Regions and Rural Centers to provide for a transition of density into the Rural Regions. This designation shall not be assigned to lands which are separated from Community Regions or Rural Centers by the Rural Residential land use designation, nor to any areas contiguous to Natural Resources unless it is for the purpose of recognizing existing platted lands (lands which have previously been subdivided.[).]"
The evidence is undisputed that no part of the Cinnabar project site is contiguous to a community region (basically, a general plan-identified larger town or area of development) or a rural center (basically, a general plan-identified smaller town or area of development). The evidence is also undisputed that the Cinnabar site is separated from community regions or rural centers in the Draft General Plan by the rural residential (RR, RRL) land use designation, except for some LDR-PL and MDR-PL (low-density and medium-density residential platted lands) to the northeast. Policy 2.2.2.3 of the Draft General Plan governs the PL (platted lands) land use designation and specifies: "The purpose of the Platted Lands (PL) overlay designation is to identify isolated areas consisting of contiguous existing smaller parcels in the Rural Regions where the existing density level of the parcels would be an inappropriate land use designation for the area based on capability constraints and/or based on the existence of important natural resources. The PL designation shall be combined with a land use designation which is indicative of the typical parcel size located within the Platted Lands boundaries. The existence of the PL overlay cannot be used as a criteri[on] or precedent to expand or establish new incompatible land uses." (First italics in original, second added.)
*1341 It is readily apparent that the LDR designation for Cinnabar is inconsistent with the Draft General Plan policies set forth above governing contiguous development and rural separation, and cannot be "saved" by the platted lands to the northeast. No reasonable person, on the evidence before the Board, could conclude otherwise. County recognizes this state of affairs. As a direct response to it, County in its brief can muster only the following: "The Board was fully aware of those provisions [i.e., the provisions on contiguous development and rural separation], however, when it approved a hybrid land use designation for the 7868-acre Cinnabar property and made that designation part of the land use map for the Draft General Plan."
In indirect ways, County attempts to show Cinnabar's compatibility with the Draft General Plan. County argues that inconsistency with simply one general plan policy should not be enough to scuttle a project. The court in San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino (1984) 155 Cal. App.3d 738 [202 Cal. Rptr. 423] concluded otherwise. There, a project was deemed inconsistent with a general plan because it conflicted with one policy in the conservation element. (Id. at p. 753.)
County looks to language in Sequoyah, supra, 23 Cal. App.4th at page 719 that "... a given project need not be in perfect conformity with each and every [general plan] policy," and that "no project could completely satisfy every policy stated in [a general plan]." That may be true. But the nature of the policy and the nature of the inconsistency are critical factors to consider.
In Sequoyah, there was substantial evidence that a subdivision project was consistent with 14 of 17 pertinent policies. The three remaining policies were amorphous in nature  they "encouraged" development "sensitive to natural land forms, and the natural and built environment." (23 Cal. App.4th at p. 719.) As to these three policies, there was conflicting evidence of consistency. (Id. at p. 720.)
There was also a question of density consistency in Sequoyah. (23 Cal. App.4th at p. 718.) But the general plan in Sequoyah afforded officials "some discretion" in this area, and their density allowances aligned with this discretionary standard. (Ibid.)
By contrast, the land use policy at issue here is fundamental (a policy of contiguous development, and the Draft General Plan states that the "Land Use Element is directly related to all other elements contained within the General Plan"); the policy is also mandatory and anything but amorphous (LDR "shall be further restricted to those lands contiguous to Community Regions and Rural Centers" [both of which are specified `town-by-town' in *1342 the Draft General Plan], and "shall not be assigned to lands which are separated from Community Regions or Rural Centers by the Rural Residential land use designation").
Moreover, Cinnabar's inconsistency with this fundamental, mandatory and specific land use policy is clear  this is not an issue of conflicting evidence. (Cf. Corona, supra, 17 Cal. App.4th at p. 996 [in rejecting a challenge of general plan inconsistency, the court there stated: "In summary, the General Plan is not as specific as those in the cases on which the [challenger] relies and does not contain mandatory provisions similar to the ones in those cases."].)
County notes the Board made Cinnabar consistent with the land use map of the Draft General Plan. As part of its general plan guidelines, the OPR publishes a checklist to determine whether a subdivision is consistent with a general plan. That checklist notes that a subdivision must not only be consistent with the general plan map, but also consistent "with the plan's written policies and standards regarding uses, density, and intensity."
Continuing in a related vein, County points to the section of the Draft General Plan entitled "Using The Plan." That section states in part: "In implementing the General Plan, it must be applied comprehensively. No single component (map, goal, objective, policy or map [sic]) can stand alone in the review and evaluation of a development project. Conversely, the absence of a specific policy enabling a particular aspect of a project (exclusive of basic density consistency) is not to be grounds for a finding of general plan inconsistency." (Italics added.)
The language highlighted above, however, sows the seeds which destroy this argument.
Finally, County looks to the policies in the Draft General Plan with which Cinnabar is consistent; these are expressed in the Board's finding of consistency with that plan (quoted at the outset of this discussion) and are confirmed by the principle that the LDR land use designation is generally appropriate in rural regions. The general consistencies expressed in this finding and principle, however, cannot overcome the specific, mandatory and fundamental inconsistencies with the LDR land use policies noted above.
We conclude that Cinnabar is inconsistent with the land-use element of the Draft General Plan and that the Board's implied finding of such consistency is not supported by substantial evidence.

*1343 c.-f.[*]
.... .... .... .... .... .... .... .

2.-4.[*]
.... .... .... .... .... .... .... .

DISPOSITION
The judgment dismissing the petition for writ of mandate and the complaint for declaratory and injunctive relief is reversed. We have concluded that: Cinnabar is inconsistent with the land-use element of County's Draft General Plan; the Board's implied finding that Cinnabar is consistent with the agriculture and forestry element regarding the Nielsen Ranch is not supported by substantial evidence; Cinnabar is inconsistent with the noise element of the Draft General Plan; the Board's findings rejecting project alternatives "C", "D" and "E" as economically infeasible are not supported by substantial evidence; the deferred impact analysis/mitigation measure for past mining contamination does not meet CEQA standards; the cumulative wildlife habitat analysis in the EIR is adequate if certain assumptions are true; the EIR must respond to the public inquiries about the effectiveness of County's erosion program and about the developer's compliance history with mitigation measures; and the Board's findings regarding Cinnabar's rezoning, planned development, and tentative subdivision map are inadequate to the extent they are based on these deficiencies.
The order awarding costs to County is reversed. The request by plaintiffs that County and Cook pay plaintiffs the respective amounts of $753.90 and $704.78, plus interest, for their copies of the administrative record provided by plaintiffs, is remanded to the trial court for further consideration in light of our reversal.
Plaintiffs are awarded their costs on appeal.
Sims, Acting P.J., and Raye, J., concurred.
NOTES
[1] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication except for parts 1c, 1d, 1e, 1f, 2, 3, and 4.
[2] The balance of the acreage in the Cinnabar site would be designated NR (natural resource), covering natural resource areas that are not amenable to development.
[3] Plaintiffs argue that Cinnabar is not consistent with the "legitimate" map of the Draft General Plan  that is, the second draft map. As we have seen, however, the Board did not apply the second draft map to Cinnabar. Instead, the Board gave Cinnabar a "floating" land use designation for general plan purposes as described above.
[*] See footnote, ante, page 1332.